## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CODY L. CORNOYER,

     Plaintiff,

vs.                                                             No. CIV 15-0474 JB/WPL

AT&T MOBILITY SERVICES, LLC,
A foreign limited liability company,

     Defendant.

### **MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on the Defendant's Motion to Compel
Arbitration and Stay Proceedings, filed November 30, 2015 (Doc. 34)("Motion").  The Court
held a hearing on February 2, 2016.  The primary issues are: (i) whether there was an arbitration
agreement made by the Management Arbitration Agreement, filed November 20, 2015 (Doc. 34-
1)("Management Arbitration Agreement"); and (ii) whether Defendant AT&T Mobility Services,
LLC, has waived its right to pursue arbitration by failing to move the Court to compel arbitration
for 213 days.  The Court first concludes that there is a valid and enforceable agreement between
Plaintiff Cody L. Cornoyer and AT&T Mobility.  Because the Court is convinced that AT&T
Mobility's delay in discovering the arbitration agreement was attributable to bureaucratic
inefficiencies, and that Cornoyer's right to a jury trial would have been lost regardless of when
AT&T Mobility filed its Motion, there is insufficient prejudice to Cornoyer for the Court to
conclude that AT&T Mobility has waived its right to pursue arbitration.  The Court thus grants

---

[1]On September 15, 2016, the Court issued an Order, filed September 15, 2016 (Doc.
49)("Order"), in which it granted Defendant's Motion to Compel Arbitration and Stay
Proceedings, filed November 30, 2015 (Doc. 24), stating: "The Court will, however, at a later
date issue a Memorandum Opinion more fully detailing its rationale for this decision."  Order at
1 n.1.  This Memorandum Opinion is the promised opinion.

the Motion requesting it compel arbitration.

## FACTUAL BACKGROUND

This federal case arises from a complaint that Cornoyer filed in the First Judicial District Court, County of Santa Fe, State of New Mexico alleging discriminatory and retaliatory treatment by AT&T, in connection with his employment at AT&T, under the New Mexico Human Rights Act, NMSA § 28-1-1 to -1-14.  See Complaint for Discrimination and Retaliation, filed May 1, 2015 (Doc. 1-1)("Complaint").   AT&T Mobility removed the action to federal court, based on diversity jurisdiction, on June 5, 2015.  See Notice of Removal, filed June 5, 2015 (Doc. 1)("Notice of Removal").  Cornoyer amended the Complaint on August 12, 2015, adding claims under the Americans with Disabilities Act Amendments Act, 42 U.S.C §§ 12101-12213.  See Amended Complaint for Discrimination and Retaliation, filed August 12, 2015 (Doc. 23)("Amended Complaint").   The Court draws the facts from Cornoyer's Amended Complaint, AT&T's Motion, and the Response to Defendant's Motion to Compel Arbitration and Stay Proceedings at 1-2, filed December 17, 2015 (Doc. 36)("Response").

Cornoyer was an AT&T Mobility employee for twelve years until he revealed that he was suffering from multiple sclerosis.  See Amended Complaint ¶ 1, at 1.  Upon revealing his multiple sclerosis, Cornoyer requested reasonable workplace accommodations, but then was fired instead of being invited to engage in an interactive process to obtain accommodation.  See Amended Complaint ¶ 1, at 1.  Cornoyer contends that, soon after disclosing his multiple sclerosis, AT&T Mobility required him to participate in a performance improvement plan starting August 4, 2014.  See Amended Complaint ¶¶ 1, 17, at 1, 3.  Such performance improvement plans relate to customers' willingness to recommend a particular employee.  See Amended Complaint ¶¶ 18-19, at 3.  AT&T Mobility required that the stores that Cornoyer's

supervisor was in charge of, for whom Cornoyer worked as a manager, reach a sixty-eight percent score of customers' willingness-to-recommend.  See Amended Complaint ¶ 22, at 3. Cornoyer alleges that his personal willingness-to-recommend score was at 59.8% in September, 2014 -- a month after his request for multiple sclerosis accommodations -- but that he was still fired on October 7, 2014, "based solely on his failure to complete his Performance Improvement Plan which called for immediate and sustained improvement of performance expectations." Amended Complaint ¶¶ 26, 29, at 3-4.  No other manager was fired in this timeframe for these reasons.  See Amended Complaint ¶ 32, at 4.  On April 15, 2015, the New Mexico Human Rights Bureau issued Cornoyer an order to afford him the right to pursue this action in state court.  See Amended Complaint ¶ 34, at 4.

As mentioned, Cornoyer filed his Complaint in state court on May 1, 2015, and AT&T Mobility removed the case to federal court on June 5, 2015.  See Complaint ¶ 1, at 1; Notice of Removal at 1.  Upon removal, AT&T Mobility filed -- after receiving a time extension -- its Answer, filed June 19, 2016 (Doc. 7).  Cornoyer amended his Complaint to add federal claims on August 12, 2016.  See Amended Complaint ¶¶ 35, 43, 46, at 4-6.  Then, according to AT&T, on October 27, 2016, -- after limited discovery had occurred, and before the discovery deadline of February 8, 2016 -- AT&T Mobility discovered that a Management Arbitration Agreement bound Cornoyer.  See Motion at 4.  The Management Arbitration Agreement, in part, provides

> This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 and following, and evidences a transaction involving commerce.  This agreement applies to any claim that you may have against any of the following: (1) any AT&T company, (2) its present or former officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, and all successors and assigns of any of them; and this agreement also applies to any claim that the Company or any other AT&T company may have against you.  Unless stated otherwise in this Agreement, covered claims include without limitation those arising out of or related to your employment or termination of employment with the Company and any other

disputes regarding the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, defamation, retaliation, discrimination or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Genetic Information Non-Discrimination Act, and state statutes and local laws, if any, addressing the same or similar subject matters, and all other state and local statutory and common law claims. This Agreement survives after the employment relationship terminates. Nothing contained in this Agreement shall be construed to prevent or excuse you from utilizing the Company's or employee benefit plans' existing internal procedures for resolution of complaints.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of a court or jury trial. Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement, but not as to the enforceability, revocability or validity of the Agreement or any portion of the Agreement, which shall be determined only by a court of competent jurisdiction.

Management Arbitration Agreement at 1-2.

AT&T Mobility notified Cornoyer and his counsel about the agreement to arbitrate on November 2, 3, and 23, 2015. See Motion at 4. The Motion asking the Court to compel arbitration was thereafter filed on November 20, 2015 -- 213 days after the case was first filed in state court. See Motion at 1; Response at 1.

The circumstances surrounding AT&T's Management Arbitration Agreement, and AT&T's delayed discovery of the agreement, are as follows. An email was sent to Cornoyer's work email account on December 5, 2011, from AT&T Mobility providing that "it had created an arbitration program that would apply to any future claims he might bring against the Company (or the Company might bring against him) if he did not opt out of the program within 60 days (that is, by February 6, 2012)." Motion at 3-4. Cornoyer was advised in the email about how he could opt out of the agreement to arbitrate, and that the decision whether to accept or decline the Management Arbitration Agreement or opt out was "entirely up to [him]," and that

there would be "no adverse consequences for anyone opting out of the Management Arbitration Agreement." Motion at 3.  The email further indicated that, "[t]o help [him] make [his] decision, it [was] very important for [Cornoyer] to review the Management Arbitration Agreement linked to this email," and provided a link -- using the words "[c]lick here to review" -- to a web page containing the Management Arbitration Agreement's text.  Motion at 3.

Follow-up reminder emails were sent to Cornoyer on December 18, 2011, and January 18, 2012.  Motion at 4.  Cornoyer received the emails, as was confirmed by a "process by which automated responses to these emails, such as would be generated if there were problems with delivery or if the recipient had set up an automated 'out of office' reply, were collected and stored."  Motion at 4.  Further, Cornoyer accessed the Management Arbitration Agreement by following the link in the email and clicked the "review complete" button on the website. Declaration of Jeremy Dunlap in Support of Defendant's Motion to Compel Arbitration and Stay all Proceedings, filed November 30, 2015 (Doc. 34-2)("Dunlap Declaration").  Ultimately, Cornoyer chose not to alert AT&T Mobility that he would like to opt out by the February 6, 2012, deadline.  See Motion at 4.  One week after AT&T Mobility deposed Cornoyer in the context of this litigation it recognized that Cornoyer was subject to the Management Arbitration Agreement.  Response at 4.  It then filed its Motion.

**PROCEDURAL BACKGROUND**

Accordingly, the Court must analyze whether (i) there exists a binding agreement to arbitrate between Cornoyer and AT&T Mobility; and (ii) whether AT&T Mobility has waived its right to pursue arbitration by the delay before filing its Motion.  The Court thus first considers whether there was formation of a binding contract to arbitrate Cornoyer's claims under New Mexico law.  Second, the Court considers whether the delay by AT&T Mobility in filing its

Motion prejudiced Cornoyer in such a fashion that it would constitute waiver of AT&T Mobility's right to pursue arbitration pursuant to the Management Arbitration Agreement.  The parties' arguments are as follows.

> ### 1.    The Motion.

In its Motion, AT&T Mobility explains that, on October 27, 2015, it discovered that Cornoyer had agreed to arbitrate his claims against AT&T Mobility when he did not opt out of a Management Arbitration Agreement by February 6, 2012.  See Motion at 1-2.  AT&T Mobility asserts that, essentially, by not opting out of the Management Arbitration Agreement, Cornoyer agreed to arbitrate any further disputes relating to his employment.  See Motion at 2.  AT&T Mobility argues that, on three occasions -- coming in December, 2011, and January, 2012 -- AT&T Mobility notified Cornoyer that he needed to follow a link to a web page containing the Management Arbitration Agreement, review the Management Arbitration Agreement, and then affirmatively opt out if he was so inclined.  See Motion at 2.  Cornoyer did not decline the Management Arbitration Agreement.  See Motion at 2.  AT&T Mobility argues: "Accordingly, this Court should grant AT&T's motion because . . . Cornoyer made a valid agreement with AT&T Mobility to arbitrate his present claims."  Motion at 5.

The Motion argues that, in accordance with New Mexico's principles of contract law -- requiring "evidence supporting the existence of an offer, an acceptance, consideration, and mutual assent" -- there was a valid contract to arbitrate between Cornoyer and AT&T Mobility. Motion at 6 (relying on Piano v. Premier Distrib. Co., 2005-NMCA-018, 107 P.3d 11).  AT&T Mobility argues that the emails AT&T Mobility sent to Cornoyer were specific about AT&T's offer to arbitrate and that Cornoyer affirmatively accepted the Management Arbitration Agreement's terms when he chose not to decline the Management Arbitration Agreement.  See

Motion at 6-7.  The Motion explains that, by the emails, Cornoyer was told that working past February 6, 2012, would constitute acceptance of the Management Arbitration Agreement if he did not affirmatively decline the Management Arbitration Agreement.  See Motion at 7-8. Further, according to the Motion, sufficient consideration supported the agreement to arbitrate, because, "[i]n the employment context, a reciprocal agreement to arbitrate can provide the requisite consideration so long as the employer does not retain the unilateral authority to terminate or modify the arbitration agreement once the employee's claim has accrued," and here, there was no such unilateral authority.  Motion at 8 (relying on Pennington v. Northrop Grumann Space & Mission Systems, Corp., 269 F. App'x 812, 819 (10th Cir. 2008).  Last, the Motion argues that there was mutual assent amongst the contracting parties, because there was objective evidence of their common understanding of the contract's terms.  See Motion at 8.  The objective evidence is that "the terms of the MAA were extraordinarily clear: they explicitly provided that Cornoyer was agreeing to arbitrate any employment-related claims instead of resolving them in court, and told him exactly how and when he could opt out of the agreement."  Motion at 9.

The Motion next argues that, in light of there being a valid agreement to arbitrate, Cornoyer's claims fall within the scope of that agreement to arbitrate.  See Motion at 9. According to AT&T Mobility, the Management Arbitration Agreement

> applies to any claim that [Cornoyer] may have against any of the following: (1) any AT&T Mobility company, (2) its present or former officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, and all successors and assigns of any of them; and this agreement also applies to any claim that the Company or any other AT&T Mobility company may have against [Cornoyer].

Motion at 10 (quoting the Management Arbitration Agreement at 1-2).  Further, the Motion provides that the Management Arbitration Agreement explicitly covers "claims includ[ing] without limitation those arising out of or related to [Cornoyer's] employment."  Motion at 10

(quoting the Management Arbitration Agreement at 1-2).  The Motion then argues that, because "Cornoyer's claims under the ADAAA [, 42 U.S.C §§ 12101-12213] and the New Mexico Human Rights Act arise out of or are related to his employment, they fall within the scope of the MAA and should be arbitrated pursuant to Cornoyer's agreement with AT&T."  Motion at 10. AT&T Mobility makes that conclusion, it says, because the Management Arbitration Agreement provides that he must arbitrate

> "claims includ[ing] without limitation those arising out of or related to your employment or termination of employment with the Company and any other disputes regarding the employment relationship, . . . termination, . . . retaliation, discrimination, . . . and claims arising under . . . [the] Americans with Disabilities Act . . . and state statutes and local laws, if any, addressing the same or similar subject matters, and all other state and local statutory and common law claims."

Motion at 4 (quoting Management Arbitration Agreement at 1-2).  In conclusion, the Motion requests that the Court compel arbitration.

### 2.    The Response.

The Response argues first that AT&T Mobility has waived its right to pursue enforcement of the agreement to arbitrate.  See Response at 1-2.  Essentially, "[b]y waiting to file its motion to compel arbitration until 213 days after the case was filed, Defendant waived any right it may have had to enforce its Management Arbitration Agreement."  Response at 2. Cornoyer, to that point, also argues that AT&T Mobility has conceded the waiver issue, because it was apprised of the potential waiver and failed to address it in its Motion.  See Response at 2. In support of a waiver, the Response provides that the New Mexico Supreme Court ruled against a party seeking to force arbitration where that party had already "raised other affirmative defenses, raised arbitration as a defense but did not press the issue, proceeded with discovery, and requested the assistance of the court to allow more time for discovery, all after the case had been set for trial."  Response at 2 (relying on Board of Educ. Taos Mun. Sch. v. The Architects,

- 8 -

Taos, 1985-NMSC-102, ¶ 12, 709 P.2d 184).  Because AT&T Mobility raised other affirmative defenses and proceeded with discovery after the Court had already set the case for trial, and also requested of the Court more time to file its answer, Cornoyer's Response argues that there was a waiver because of AT&T's conduct in the delay.  See Response at 3.  Further, according to the Response, it is no excuse that AT&T Mobility did not know of the Management Arbitration Agreement at the time that Cornoyer filed the lawsuit, because there is no evidence that there was fraud or misrepresentation.  See Response at 4.

The Response next argues that, regardless of waiver, there was no agreement to arbitrate in the first place, because there was no clear, positive, and unambiguous acceptance on Cornoyer's behalf.  See Response at 5-6.  According to the Response, the emails telling Cornoyer about the Management Arbitration Agreement came during an ownership transition that had inundated employees with new training materials and forms.  See Response at 6.  To that point, Cornoyer reports that he does not remember seeing the emails or of having knowledge of the requirement to affirmatively opt out of the agreement to arbitrate, and argues that there thus could not have been acceptance.  See Response at 6.  The Response thus argues that the Court cannot excuse AT&T's ignorance of the agreement to arbitrate in the waiver context while at the same time holding Cornoyer to his supposed knowledge of the agreement.  See Response at 6.

Lastly, the Response argues AT&T Mobility neglected to follow the Management Arbitration Agreement's noticing terms when it did not notify Cornoyer of the claims to be arbitrated with forms provided by the arbitrator, JAMS, Inc., on its website.  See Response at 7.  According to the Response, this failure means AT&T Mobility cannot enforce the Management Arbitration Agreement.  See Response at 7.

3.      **The Reply**.

In Defendant's Reply Brief in Support of its Motion to Compel Arbitration and Stay Proceedings, filed January 4, 2016 (Doc. 38)("Reply"), AT&T Mobility first argues that it has not waived its right to enforce the Management Arbitration Agreement.  See Reply at 1.  AT&T Mobility maintains that it did not need to address the potential waiver issue in its Motion, because the burden to establish waiver is on the party asserting waiver.  See Reply at 1 (relying on Peterson v. Shearson/American Express, Inc., 849 F.2d 464, 466 (10th Cir. 1988)). Regarding the waiver argument's merits, the Reply contends that a "mere recitation of that time period is far from sufficient to demonstrate waiver."  Reply at 2.  Instead, the Reply asserts that, "[u]ltimately, a party seeking waiver of an arbitration agreement must demonstrate that waiver is appropriate in light of a party's attempt to improperly manipulate the judicial process."  Reply at 2-3 (relying on Healy v. Cox Commc'ns, Inc., 790 F.3d 1112, 1116 (10th Cir. 2015)).  The Reply maintains that, in sum, Cornoyer must demonstrate prejudice to establish AT&T Mobility's waiver of its right to pursue arbitration.  See Reply at 4.  The Reply thus provides that

> Cornoyer has made no effort to explain how he would be prejudiced by continuing these proceedings in arbitration beyond the bare recitation of the time that has elapsed and an oblique mention of his deposition, which would have been permitted under the rules of an arbitration in any event.  He has, in short, failed to demonstrate a waiver.

Reply at 5.

The Reply then returns to the same arguments that AT&T Mobility made in the Motion regarding Cornoyer's alleged acceptance of the agreement to arbitrate.  See Reply at 5-8. Essentially, the Reply argues that the fact that "Cornoyer does not remember seeing" the Management Arbitration Agreement "does not throw into doubt AT&T's unambiguous and undisputed evidence that he saw and acknowledged it in 2012."  Reply at 7-8.  The Reply

maintains that there is objective evidence that the emails were sent and that Cornoyer accessed the Management Arbitration Agreement, and, in fact, affirmatively clicked to confirm that he had reviewed that Management Arbitration Agreement.  See Reply at 7.

**4.  The Hearing.**

The Court held a hearing on February 2, 2016.  See Transcript of Hearing at 1:1 (taken February 2, 2016)(Gage)(Faber)(Court)("Tr.").[2]  The parties largely stuck to the contents of the Motion, Response, and Reply.  See Transcript of Hearing at 1:1-19:15.  AT&T Mobility began by first arguing that the formation of an enforceable arbitration agreement was evident and then turned to the issue of its waiver of the right to pursue arbitration.  Tr. at 3:17-25; 4:1-25 (Gage).  AT&T Mobility reiterated that "the company in a very simple, straightforward and clear manner offered a dispute arbitration agreement" which Cornoyer accepted.  Tr. at 3:21-23 (Gage).  AT&T Mobility then maintained that

> Mr. Cornoyer himself bears a substantial burden to show that the company waived its right to enforce the management arbitration agreement.  He has not done so.  He is merely claiming that because of the passage of time that the Court should find that the Management Arbitration Agreement is waived.  He's not shown any prejudice whatsoever.

Tr. at 5:9-16 (Gage).  The Court then directed AT&T Mobility's arguments to the contract formation process, at which point AT&T Mobility detailed the multiple emails and the interactive process by which employees like Cornoyer could choose to opt out of the Management Arbitration Agreement.  See Tr. at 6:1-25; 7:1-4 (Gage).

Cornoyer was then given an opportunity to make his arguments, and he began by highlighting the 213 day delay from the start of the lawsuit until AT&T Mobility's Motion.  See

---

[2]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Tr. at 7:12-19 (Faber). This delay, Cornoyer argues -- AT&T Mobility filed the Motion six days before the discovery deadline -- constitutes prejudice and is grounds for waiver. <u>See</u> Tr. at 7:12-19. Cornoyer thereafter conceded, however, that the only events that have taken place during the discovery period were a deposition of Cornoyer and of AT&T Mobility -- events that likely would have occurred in the arbitration process regardless. <u>See</u> Tr. at 8:1-16 (Faber). Cornoyer then said that the main prejudice was "losing his right to a jury trial," which is something he specifically sought by filing suit in state court and the consequent loss of fees paid during the litigation. Tr. at 9:2-16 (Faber). Last, Cornoyer argued that this delay was AT&T Mobility engaging in forum shopping -- state court, to federal court, to arbitration. <u>See</u> Tr. at 10:1-24 (Faber).

The Court then posited to Cornoyer that "it looks to me and correct me if I'm wrong, the affidavit you got from your client, he's not disputing anything that AT&T Mobility is saying about the history of entering into this agreement. He's just saying he doesn't remember it." Tr. at 11:5-13 (Court). Cornoyer then conceded that AT&T Mobility had proffered the correct version of the facts surrounding the emails that AT&T Mobility sent alerting him of the Management Arbitration Agreement. <u>See</u> Tr. at 12:1-4 (Faber).

The Court then asked AT&T Mobility how it had lost track of the Management Arbitration Agreement, to which AT&T Mobility replied:

> Unfortunately, in this particular instance when the lawsuit came in and worked its way through the bureaucracy, the person who first got it and assigned it to outside counsel to start defending it didn't check. It was subsequently checked when it came to the attention of another internal AT&T lawyer who asked the question . . . is he bound and they checked and promptly his lawyer was notified of the existence of the Management Arbitration Agreement and his client's agreement to it.

Tr. at 13:5-13 (Gage). The Court then asked Cornoyer what more, beyond the email and website

interaction, he needed to demonstrate assent.  See Tr. at 15:6-8 (Court).  Cornoyer replied that

there should have been a notification that he had not declined.  See Tr. 15:9-17 (Faber).  In

conclusion, the Court provided:

> It just seems that, it doesn't seem like this is a waiver situation.  Both sides could
> have been, should have been aware that they had an arbitration agreement and
> didn't.  It doesn't seem like any games were played here, it just seems to be that
> in a bureaucracy that this wasn't brought to anybody's attention but the plaintiff
> wasn't aware of it either but it seems pretty clear that he signed the agreement.  It
> seems the downside to the parties is fairly low here, I agree with Mr. Faber, it
> might have changed his evaluation of taking the case, and things like that but he'd
> have lost it the day he filed the case if AT&T had brought the agreement to his
> attention . . . .

Tr. at 19:2-15 (Court).

## RELEVANT LAW REGARDING ARBITRATION AGREEMENTS

 The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), governs the enforcement of

arbitration clauses in commerce and maritime contracts.  Section 2 of Title 9 of the United States

Code provides:

> A written provision in . . . a contract evidencing a transaction involving commerce
> to settle by arbitration a controversy thereafter arising out of such contract or
> transaction, or the refusal to perform the whole or any part thereof, or an
> agreement in writing to submit to arbitration an existing controversy arising out of
> such a contract, transaction, or refusal, shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in equity for the revocation
> of any contract.

9 U.S.C. § 2.  "The FAA thereby places arbitration agreements on an equal footing with other

contracts, and requires courts to enforce them according to their terms."  Rent-A-Center, W., Inc.

v. Jackson, 561 U.S. 63, 67 (2010)(citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S.

440, 443 (2006); Volt Info. Sci., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S.

468, 478 (1989)).  "Like other contracts, however, they may be invalidated by 'generally

applicable contract defenses, such as fraud, duress, or unconscionability.'"  Rent-A-Center, W.,

Inc. v. Jackson, 561 U.S. at 68 (citing Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687

(1996)).  Accord AT&T Mobility, LLC v. Concepcion, 563 U.S. 333, 339 (2011).  In Prima

Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967), the Supreme Court of

the United States held that, once a court determines that a claim is subject to arbitration, the court

is without authority to address the claim's merits.  See 388 U.S. at 400 ("Section 3 requires a

federal court in which suit has been brought upon any issue referable to arbitration under an

agreement in writing for such arbitration to stay the court action pending arbitration once it is

satisfied that the issue is arbitrable under the agreement.")(internal quotations omitted).  "[T]he

basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce

agreements to arbitrate."  Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).

Under FAA § 4, a party "aggrieved" by the failure of another party "to arbitrate under a

written agreement for arbitration" may petition a federal court "for an order directing that such

arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If a party is

aggrieved by the refusal of another to arbitrate under a written agreement, the district court, upon

petition, "shall hear the parties, and upon being satisfied that the making of the agreement for

arbitration or the failure to comply therewith is not in issue, the court shall make an order

directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9

U.S.C. § 4.  Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l

Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a

contract evidencing a transaction involving commerce to settle by arbitration a controversy

thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon

such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "If a

party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal

court must consider the challenge before ordering compliance with that agreement under § 4."

Rent-A-Center, W., Inc. v. Jackson, 561 U.S. at 71.

1.      **Strong Federal Policy Favoring Arbitration**.

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."  Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994).   See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984) ("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Ams. Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24).   Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision.  See Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 474 (stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts."). When the applicability of arbitration is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25).

2.      **Existence of a Valid Arbitration Agreement**.

The Supreme Court has noted that "[a]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)(internal citations omitted).  As the United States Court of Appeals for the Tenth Circuit

has noted, "[t]he presumption in favor of arbitration . . . disappears when the parties dispute the existence of a valid arbitration agreement." Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002)("Dumais II"). The New Mexico Court of Appeals has reached a similar conclusion: "[U]nder either the FAA or the [state Act], a legally enforceable contract is a prerequisite to arbitration; without such a contract, parties will not be forced to arbitrate." Heye v. Am. Golf Corp. Inc., 2003-NMCA-138 ¶ 8, 80 P.3d 495, 498 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944-45). In the Tenth Circuit and in the courts of New Mexico, the "existence of an agreement to arbitrate is a threshold matter which must be established before the [the arbitration statutes] can be invoked." Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (describing whether there is an agreement to arbitrate as a "threshold question").

In determining whether the parties agreed to arbitrate a matter, the court should apply state-law principles regarding the formation of contracts. See First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944; Avedon Eng'g, Inc. v. Seatex, 126 F.3d at 1287; Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187 at *4-8 (D.N.M. September 12, 2006)(Browning, J.); Piano v. Premier Distrib. Co., 2005-NMCA-18, ¶ 6, 107 P.3d 11, 14. It is a fundamental tenet of contract law "that each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." Ballard v. Chavez, 1994-NMSC-007, ¶ 8, 868 P.2d 646, 648. Under New Mexico law, "[a] legally enforceable contract requires evidence supporting the existence of 'an offer, an acceptance, consideration, and mutual assent." Piano v. Premier Distrib. Co., 2005-NMCA-18, ¶ 6, 107 P.3d at 14 (quoting Heye v. Am. Golf. Corp., 2003-NMCA-139, ¶ 9, 80 P.3d at 498).

Consideration is a promise to do something that a party is under no obligation to do or to forbear from doing something it has a legal right to do.  See Talbott v. Roswell Hosp. Corp., 2005-NMCA-109, ¶ 16, 118 P.3d 194, 198.  A valid contract must be mutually obligatory, i.e. both sides must provide consideration.  See Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d at 499.  Thus, a promise must be associated with a corresponding obligation; a promise without an obligation "in reality, promises nothing -- it is illusory, and it is not consideration." Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d at 499.

In Dumais v. American Golf Corp., 150 F. Supp. 2d 1182 (D.N.M. 2001)(Vazquez, J.), aff'd by 299 F.3d 1216, (10th Cir. 2002), the Honorable Martha Vazquez, United States District Judge, was asked to determine if an arbitration provision contained in an employment handbook was enforceable, and precluded an employee from bringing a claim for sexual harassment and constructive discharge under Title VII of the Civil Rights Act of 1964 against her employer.  See Dumais v. American Golf Corp., 150 F. Supp. 2d at 1188.  The employer suggested that two documents that the employee executed when she became an employee constituted a valid agreement to arbitrate such disputes.  See Dumais v. American Golf Corp., 150 F. Supp. 2d at 1188, 1194.  The documents included: (i) a form acknowledging that the employee had read and would abide by the employer's arbitration program -- the "We Can Work It Out" program; and (ii) an acknowledgment form that she would comply with the employment handbook and the "We Can Work It Out" program.  See Dumais v. American Golf Corp., 150 F. Supp. 2d at 1188, 1194.

Judge Vazquez, in Dumais v. American Golf Corp., concluded that the arbitration agreement embodied in the "We Can Work It Out" program to be illusory, because it was executed over two months after the employee began her employment.  Dumais v. American Golf

- 17 -

Corp., 150 F. Supp. 2d at 1194.  The agreement modified the terms of employment -- it divested the employee's right to have disputes heard in an Article III court -- without consideration in return for that divestiture.  See Dumais v. American Golf Corp., 150 F. Supp. 2d at 1194.  In the particular agreement at issue, Judge Vazquez noted that inconsistent provisions in the employment agreement made it unclear whether the arbitration agreement was binding on the employer and, therefore, the potentially unilateral character of the promise to arbitrate made it illusory.  Dumais v. American Golf Corp., 150 F. Supp. 2d at 1194.

Judge Vazquez limited her holding, however, by acknowledging that, under New Mexico law, an arbitration agreement is not necessarily invalid simply because it contains terms that favor one party over another.  See Dumais v. American Golf Corp., 150 F. Supp. 2d at 1191.  For an agreement to be invalid, the terms of the agreement must be unconscionable.  See Dumais v. American Golf Corp., 150 F. Supp. 2d at 1192.  Judge Vazquez commented that modifications in scheduling and compensation may be economic necessities of doing business, but an alteration in an arbitration agreement requires the employee to "surrender [rights] . . . far more important than those associated with mere conditions of employment."  Dumais v. American Golf Corp., 150 F. Supp. 2d at 1193-94.

The Tenth Circuit affirmed Judge Vazquez' holding in a de novo appeal.  See Dumais II, 299 F.3d at 1219.  In so doing, the Tenth Circuit stated: "We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."  Dumais II, 299 F.3d at 1219 (citing decisions of the United States Courts of Appeals for the Fourth, Sixth, and Seventh Circuits).

In Heye v. American Golf Corporation, the New Mexico Court of Appeals considered a question similar to the one that the federal court addressed in Dumais v. American Golf

- 18 -

Corporation. See Heye v. American Golf Corporation, 2003-NMCA-138, ¶¶ 2-3, 80 P.3d at 497. The New Mexico Court of Appeals assessed the validity of an arbitration agreement in an employment contract that bound the employee, but not the employer, to arbitrate and that the employee signed after she was hired. See Heye v. American Golf Corporation, 2003-NMCA-138, ¶¶ 2-3, 80 P.3d at 497. In concluding that the agreement was illusory, the New Mexico Court of Appeals noted that the agreement permitted the employer to "amend, supplement, rescind or revise the policy regarding arbitration at its whim." Heye v. American Golf Corporation, 2003-NMCA-138, ¶ 13, 80 P.3d at 499. Although the employee was bound to arbitrate, the employer "remains free to selectively abide by its promise to arbitrate" and therefore the employer's "promise to arbitrate does not provide the consideration necessary to enforce the arbitration agreement." Heye v. American Golf Corporation, 2003-NMCA-138, ¶ 15, 80 P.3d at 500.

In 2005, the New Mexico Court of Appeals, in Piano v. Premier Distributing Company, again considered an arbitration agreement that an employer had imposed after employment had commenced. See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 2, 107 P.3d at 11. The plaintiff began employment as an administrative assistant with the defendant on October 21, 1986, and signed an arbitration agreement on January 7, 1999, with the understanding that, if she did not sign the agreement, she would be fired. See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 2, 107 P.3d at 11. The New Mexico Court of Appeals concluded that the arbitration agreement was illusory, because the employer did not support it with consideration. See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 19, 107 P.3d at 17. The New Mexico Court of Appeals, in Piano v. Premier Distributing Company, rejected the employer's argument that continued at-will employment and the reciprocal promise to arbitrate were sufficient

consideration to sustain the agreement.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 19, 107 P.3d at 17.  First, the New Mexico Court of Appeals reasoned that "[t]he implied promise of continued at-will employment placed no constraints on [the employer's] future conduct; its decision to continue Plaintiff's at-will employment was entirely discretionary." Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 8, 107 P.3d at 14.  Second, the New Mexico Court of Appeals wrote that, under the arbitration agreement's terms, the employer had "unilateral authority to modify the Arbitration Agreement . . . [and the agreement] does not require [the employer] to seek [the employee's] approval before altering the terms of the Arbitration Agreement."  Heye v. American Golf Corporation, 2003-NMCA-138 ¶ 14, 107 P.3d at 16.

Nevertheless, when New Mexico courts have found arbitration agreements to be valid, they have been given broad application.   In K.L. House Construction Co. v. City of Albuquerque, the Supreme Court of New Mexico held that a valid arbitration clause existed and that the parties were compelled to arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the subject matter of the contract."  1978-NMSC-025, ¶ 8, 576 P.2d at 754.

> When a broad and general arbitration clause is used . . . the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed.  When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters.  Barring such limiting language, the courts only decide the threshold question of whether there is an agreement to arbitrate.

K.L. House Construction Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754.

Finally, an arbitration clause does not require consideration independent from the consideration that sustains the contract as a whole.  See Barker v. Golf U.S.A., Inc., 154 F.3d 788, 792 (8th

Cir. 1998)("[M]utuality of obligation is not required for arbitration clauses so long as the contract as a whole is supported by consideration."); Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 451-52 (2d Cir. 1995).  See also Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1194 (D.N.M. 2015); Perez v. Qwest Corp., 883 F. Supp. 2d 1095, 1104 (D.N.M. 2012); THI of New Mexico at Las Cruces, LLC v. Fox, 727 F. Supp. 2d 1195, 1206 (D.N.M. 2010); Parrish v. Valero Retail Holdings, Inc., 727 F. Supp. 2d 1266, 1273 (D.N.M. 2010); Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, No. CIV 05-1331 JB/LCS, 2006 WL 4061187, at *4 (D.N.M. Sept. 12, 2006).

## RELEVANT LAW REGARDING CONTRACT ACCEPTANCE IN NEW MEXICO

For a contract to be legally valid and enforceable in New Mexico, an offer, an acceptance, consideration, and mutual assent must factually support the contract.  See Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 9, 918 P.2d 7, 10 (internal quotation marks and citation omitted); DeArmond v. Halliburton Energy Serv., Inc., 2003-NMCA-148, ¶ 9, 81 P.3d. 573, 577.  Acceptance must occur for an agreement to be binding.  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 16, 889 P.2d 171, 174.

Acceptance must be clear, positive, and unambiguous.  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 8, 889 P.2d 171, 173; Tatsch v. Hamilton-Erickson Mfg. Co., 1966-NMSC-193, ¶ 10, 418 P.2d 187, 189.  A party's acceptance of a written offer may be express or implied by conduct.  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 14, 889 P.2d at 174.  Where the offer invites acceptance through performance, rather than in writing, the beginning of invited performance is an implied acceptance.  See Long v. Allen, 1995-NMCA-119, ¶ 6, 906 P.2d at 756.  In DeArmond v. Halliburton Energy Serv., Inc., for example, Halliburton Energy invited acceptance through performance by informing employees in a

memorandum that "[y]our decision to . . . continue your current employment after January 1, 1998 means you have agreed to and are bound by the terms of this [arbitration] Program." 2003-NMCA-148, ¶ 9, 81 P.3d. 573, 577.

### LAW REGARDING WAIVER OF ARBITRATION AGREEMENTS

The Tenth Circuit has established a six-factor test to determine if the right to arbitrate has been waived.  See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d 1112, 1116 (10th Cir. 2015).  The Court must consider:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116 (alteration in original). When applying the factors, the test is not mechanical: "Rather, these factors reflect certain principles that should guide courts in determining whether it is appropriate to deem that a party has waived its right to demand arbitration."  Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116.  The Court's analysis is focused on the notion that a party "may not play fast and loose with the judicial machinery and deceive the courts," and "[a]n important consideration in assessing waiver is whether the party now seeking arbitration is improperly manipulating the judicial process."  Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116 (citations omitted).

Often a party will waive arbitration where it moves for arbitration in tandem with other motions, even though the party had been aware for some time of its right to compel arbitration.

See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117.

> Rather than requesting that its motion for summary judgment be stayed until its motion to compel was decided [the party] moved to compel arbitration on the same day it moved for summary judgment, even though it was aware that arbitration could have been raised earlier. . . . one of . . . many attempts, detailed by the district court, to [c]learly . . . play heads I win, tails you lose by manipulating the litigation machinery and omitting known material facts about the absent class members from its briefing.

Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117 (internal quotation marks omitted).  Cf. Hurley v. Deutsche Bank Trust Co. Ams., 610 F.3d 334, 339 (6th Cir. 2010)(noting that defendants waive their "right to arbitrate by failing to assert that right in a timely fashion and instead participating in litigation-related activities," in particular motions for summary judgment); St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., 969 F.2d 585, 589 (7th Cir. 1992)("A party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum.").

Another important factor for the court's analysis is how significantly a party has invoked the machinery of litigation.  See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117.  In some cases, a waiver may be found where a "Court has read literally thousands of pages of briefs, conducted several hearings, including a class certification hearing, and issued dozens of Orders, including rulings on Motions to Dismiss, *Daubert* Motions, Class Certification, and recently a Motion for Summary Judgment."  Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117 (emphasis in original).  In accordance with the factors, making ample use of discovery alone will also support a finding of waiver.  See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1118.  The prejudice borne by a party that has been subjected to the machinery and costs of litigation, only to have it taken away at the last minute, is as important to the analysis as the consideration of the integrity of the judicial process.

See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1118. See also United States v. Youngbear, No. CR 07-1560 JB, 2008 WL 6045499, at *4 (D.N.M., Oct. 21, 2008)(Browning, J.)("The Supreme Court of the United States has stated: 'A party may waive any provision, either of a contract or of a statute, intended for his benefit.'" (quoting United States v. Mezzanatto, 513 U.S. 196, 201 (1995)); Lucero v. Martinez, No. CIV 03-1128 JB/DJS, 2006 WL 1304945, at *2 (D.N.M., Mar. 11, 2006)(Browning, J.).

## ANALYSIS

The Court is tasked with determining whether (i) there exists a binding agreement to arbitrate between Cornoyer and AT&T Mobility, and (ii) whether AT&T Mobility has waived its right to pursue arbitration by the delay before filing its Motion.  The Court first concludes that there was formation of a binding contract to arbitrate Cornoyer's claims under New Mexico law. Second, the delay by AT&T Mobility in filing its Motion did not prejudice Cornoyer in such a fashion that would constitute waiver of AT&T Mobility's right to pursue arbitration pursuant to the Management Arbitration Agreement.

## I.   CORNOYER ACCEPTED THE MANAGEMENT ARBITRATION AGREEMENT.

The Court first applies state-contract law to determine if an agreement was made. See Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL at *4-8.  It is undisputed that AT&T Mobility's offer to arbitrate claims, memorialized in the Management Arbitration Agreement, is clear and unambiguous.  See Response at 5-6.  Cornoyer is only arguing that he did not accept the Management Arbitration Agreement's terms because the offer was extended in the midst of a deluge of forms and paperwork, occurring during a shift in ownership, and he thus does not remember making the acceptance.  See Response at 5-6.  The facts, however, indicate that Cornoyer received three separate emails asking him to review the

Management Arbitration Agreement, and that he ultimately indicated -- by following the email's link to the Management Arbitration Agreement and clicking a button on that page signaling that he had reviewed the document -- that he had reviewed the document.  See Reply at 7-8.  And, when, in accordance with the agreement's terms, he did not take action to opt out of the Management Arbitration Agreement by February 6, 2012, he manifested his acceptance.  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 14, 889 P.2d at 174; DeArmond v. Halliburton Energy Serv., Inc., 2003-NMCA-148, ¶ 9, 81 P.3d. 573, 577 (concluding there was acceptance of an arbitration agreement where Halliburton Energy invited acceptance through performance by informing employees in a memorandum that "[y]our decision to . . . continue your current employment after January 1, 1998 means you have agreed to and are bound by the terms of this [arbitration] Program.").

## II.     AT&T MOBILITY DID NOT WAIVE ITS RIGHT TO PURSUE ARBITRATION.

Cornoyer primarily argues that AT&T Mobility waived its contractual right to enforce the terms of its arbitration agreement by waiting 213 days before moving the Court to compel arbitration.  In addition to that delay, Cornoyer expressed concern that he had pursued the litigation with a jury trial in mind; he contends that, had the arbitration agreement been evident earlier, he may have pursued his case differently.  See Tr. at 9:2-16 (Faber).  The Court considers many other factors, in a non-mechanical fashion, however, when determining whether a party opposing arbitration has made a showing of prejudice sufficient to deny a motion to compel arbitration.  See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116.  As mentioned, those factors include:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration

enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116 (alterations in original).

As the Court explained at the hearing, both Cornoyer and AT&T Mobility should have been aware of the arbitration agreement, and are equally responsible for their ignorance.  See Tr. at 19:2-15 (Court).  Cf. Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116 (regarding whether the party's actions are inconsistent with the right to arbitrate).  Further, the delay in discovering the arbitration agreement appears to be attributable to bureaucratic inefficiencies, as opposed to trial strategy.  See Tr. at 13:5-13 (Gage).  Cf. Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116.  Regarding the invocation of the machinery of litigation, Cornoyer concedes that the depositions taken of himself and AT&T Mobility will not lose their usefulness in an alternate arbitration proceeding. Cf. Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116.  Moreover, because the availability of a jury trial -- Cornoyer's primary argument for prejudice -- would have been lost regardless of when AT&T Mobility filed its Motion, there is, in the Court's view, a lesser measure of prejudice to Cornoyer than has been true in the cases where a wavier was found.  See Tr. at 9:2-16 (Faber).  Cf. Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116-18 (discussing, generally, the prejudice in litigation where the "Court has read literally thousands of pages of briefs, conducted several hearings, including a class certification hearing, and issued dozens of Orders, including rulings on Motions to Dismiss, *Daubert* Motions, Class Certification, and recently a Motion for Summary Judgment.").  The Court thus concludes that these circumstances -- where no party is blatantly manipulating the litigation machinery, and the

prejudice is slight -- do not constitute a waiver of AT&T Mobility's right to pursue arbitration.

**IT IS ORDERED** that the Defendant's Motion to Compel Arbitration and Stay

Proceedings, filed November 30, 2015 (Doc. 34), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Daniel M. Faber
Law Office of Daniel Faber
Albuquerque, New Mexico

      *Attorney for the Plaintiff*

Stacey D. Campbell
Daniel M. Combs
Campbell Litigation, P.C.
Denver, Colorado

-- and --

Megan Muirhead
Modrall, Sperling, Roehl,
   Harris & Sisk, P.A.
Albuquerque, New Mexico

-- and --

Kenneth Gage
Sean M. Smith
Paul Hastings LLP
New York, New York

      *Attorneys for the Defendant*